UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO. 3:19-CR-249 (JBA) |
| ERIC RUNDSTROM | : | October 11, 2021 |

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Eric Rundstrom, a devoted father with no criminal history, began using child pornography in his forties during a period of deep depression following his stepfather's suicide. His arrest in this case in February 2019 "woke [him] up." Exhibit A (Letter to the Court) at 4. He immediately admitted responsibility for his actions when FBI agents showed up at his door, and he has never wavered in his acceptance of responsibility. For almost three years since his arrest, he has fully complied with strict conditions of pretrial release and has abstained completely from pornography, drugs, and alcohol. He voluntarily engaged in intensive individual therapy after his arrest to try to understand why he committed his offense. Through therapy and self-reflection, he has developed tremendous insight and remorse, as evidenced by his detailed, heartfelt letter to the Court. *See* Exhibit A.

Because Mr. Rundstrom pled guilty to receipt of child pornography under 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1), he is subject to a mandatory minimum of five years in prison, and a mandatory minimum of five years of supervised release. For the reasons explained in this memorandum, Mr. Rundstrom respectfully asks the Court to impose the mandatory minimum sentence, which is the sentence that is sufficient but not greater than necessary to serve the purposes of sentencing.

## I.  HISTORY AND CHARACTERISTICS

Now 47 years old, Eric Rundstrom is a devoted father, son, brother, nephew, uncle, and friend, with no criminal history and a long track record of employment. As a young child, he witnessed his grandmother's death in a terrible car accident. This traumatic event was followed by his parents' divorce and subsequent years of instability, during which he moved homes and schools repeatedly. He turned to drugs and alcohol to cope, struggling with addiction to various substances over the years, including alcohol, heroin, cocaine, and painkillers. Increasingly, he coupled his drug use with use of adult pornography.  When he entered a deep depression in his forties following his stepfather's suicide, he began using child pornography.

In the three years since his arrest, he has rehabilitated himself. He promptly and repeatedly accepted responsibility for his offense, expressed sincere remorse, engaged in treatment, earned his GED, worked full-time at a grocery store including throughout the COVID-19 pandemic, spent every weekend with his son, and completely abstained from pornography, drugs, and alcohol.

### A.  A fatal car accident cast a shadow over Eric's childhood.

In 1982, Eric's 62-year-old paternal grandmother, Carmel Rundstrom, was driving in Woodbridge with 8-year-old Eric, his 5-year-old brother, and 5-year-old cousin. *See* Exhibit B (newspaper article). When another car tried to pass them illegally, Ms. Rundstrom lost control of her car and crashed into a tanker truck. The family's car flipped over twice and landed upside down. Eric's grandmother was killed in the accident. *Id.*; PSR ¶ 61. Eric remembers seeing his grandmother "face down dead in the road." Exhibit A at 1. Eric, his brother, and his cousin survived with minor physical injuries. The emotional impact, however, was intense and long-lasting for Eric.

Eric received no counseling after the accident to help him process the traumatic experience. He felt his grandmother's absence acutely. His grandmother had lived with Eric's family, and their

bond was even closer than his bond with his parents. Eric remembers her cooking breakfast for him and his siblings, playing games with them, and taking them on long walks in the woods behind their house. Exhibit A at 2. He recalls that when he woke up from a nightmare, it was his grandmother's room he would run to. *Id.* The unprocessed trauma of the accident continued to haunt Eric through his childhood and teenage years. Decades later, after engaging in therapy following his arrest, Eric understands that "the trauma in my early childhood, and how it was never properly addressed, left me to go forward into life in search of coping mechanisms on my own to deal with the pain and sadness." Exhibit A at 2.

**B.   After his grandmother's death, Eric's childhood and teenage years were characterized by instability.**

After the car accident, Eric yearned for stability and comfort, but experienced the opposite. His father "became distant after the loss of his mother." Exhibit A at 2. His parents divorced shortly thereafter. Eric, his mother, and his siblings moved to Hamden, Connecticut, which was a jarring change for Eric, who was used to rural Bethany. PSR ¶ 62. Their father moved to Wallingford, and later to Agawam, Massachusetts. When Eric and his brother would visit their father on the weekends, he engaged in inappropriate, physically painful behavior towards them. *See* PSR ¶ 63. His father also abused alcohol. Exhibit C at 6 (Dr. Krueger Report, filed under seal).

Eric moved numerous times in his middle and high school years, bouncing back and forth between his mother and father, and switching high schools five times. His mother remarried, and Eric changed his last name to his stepfather's name, Magoveny. PSR ¶ 60. That marriage, too, ended in divorce. Eric's mother would marry and divorce five times in total, adding to Eric's sense of dislocation and impermanence. He reflects, "I have never felt completely settled in life. . . . Throughout my life, every time I feel I am establishing roots I am pulled up and dislocated." Exhibit A at 4.

3

Despite his natural intelligence, Eric did not graduate from high school. Dr. Krueger, a psychiatrist who evaluated Eric, noted that although Eric had "an early aptitude for literature, [h]e developed an aversion to school and inability to study," which may have been attributable to his "childhood depression." Exhibit C at 13. Eric joined the United States Army at age 18, the summer before his senior year, hoping "for a sense of stability," and the opportunity to serve his country. Exhibit A at 4. He returned to school after basic training but then dropped out three months before high school graduation. He then completed advanced individual training for the Army, but shortly thereafter, there were dramatic cut-backs in United States military spending, due to the end of the Cold War and the dissolution of the Soviet Union in the early 1990s. Accordingly, Eric remained in the Army Reserves and was never deployed. He was honorably discharged in 1997. PSR ¶ 88.



*Eric after completing Basic Training for the Army at age 18*

**C. Eric began using alcohol and drugs as a teenager, and his drug use escalated in adulthood.**

In high school, Eric began drinking heavily and using marijuana. He drank hard liquor, often before and after school. Exhibit C at 5. His mother, concerned about his drinking, enrolled him in an outpatient treatment program in Meriden called Another Street. *Id.*; PSR ¶ 73. Although his drinking

4

waned as he entered his twenties, addiction remained an issue for him. He was addicted, at different periods of his adulthood, to cocaine, painkillers, heroin, and marijuana. PSR ¶ 73.

After therapy, Eric has posited that he used alcohol and drugs as "coping mechanisms . . . to deal with the pain and sadness" of his childhood. Exhibit A at 2. This idea is well-supported by research. In 1990, two doctors conducted a landmark study that revealed a link between what they termed Adverse Childhood Experiences (ACEs) and later outcomes. ACEs include things like physical, emotional, and sexual abuse, physical and emotional neglect, and family dysfunction.[1] The doctors found a robust relationship between ACEs and poor physical and mental health outcomes, including alcoholism and drug use.[2] More ACEs are correlated with worse outcomes, and fewer ACEs are correlated with better outcomes. ACEs are associated with learning and behavioral problems, which translate into higher rates of workplace absenteeism, financial problems, and lower lifetime income.[3] The study's groundbreaking contribution was a detailed account of how children do not "grow out" of traumatic experiences. Rather, traumatized children continue to carry the marks of that trauma in their brains and their bodies throughout their lives. This research is instructive in understanding the long-term impact that Eric's childhood had on him. Dr. Krueger, who evaluated Eric, found that Eric had a score of 4 on the ACEs scale, which is "a significantly elevated score, suggesting significant childhood adversity." Exhibit C at 10. The car accident at age 8, his grandmother's death, his parents' divorce, and the many years of instability that followed left a lasting

---

[1] Centers for Disease Control and Prevention, *Adverse Childhood Experiences (ACEs)*, https://www.cdc.gov/violenceprevention/aces/index.html.

[2] *Id.*; *see also* Bessel Van Der Kolk, *The Body Keeps Score: Brain, Mind, and Body in the Healing of Trauma* at 148-49 (2014).

[3] *Id.*

impression on Eric and likely contributed to his educational, substance use, and mental health challenges later in life.

**D. Although his marriage was short-lived, his relationship with his son has been a positive constant in his life for 18 years.**

After recovering from a serious heroin addiction at age 27, Eric began dating Jessica Luciano around 2002. She got pregnant, and they decided to marry. Their son Thomas ("Tommy") was born in September 2003. Eric was overjoyed to be a father, but the family struggled financially from the start. After taking out a loan to cover a necessary lead abatement project in their house, *see* Exhibit A at 3, Eric struggled to cover the family's costs, which included the loan on top of their mortgage, on his income alone. Their financial difficulties led to tension in Eric and Jessica's marriage; they also experienced tension due to their religious differences, as Jessica is a Jehovah's Witness. They divorced in 2005, when Tommy was still a young toddler. Eric attempted to remain in the home after Jessica moved out, but he could not keep up with the bills, and about a year after their divorce, the house was foreclosed upon.

Tommy recently turned 18, but Eric had joint custody of him from the divorce onward, spending every weekend with him and consistently paying child support. Tommy and Eric have been positive constants in one another's lives for the last 18 years. By all accounts, Eric has been a dedicated, loving, and reliable father, who has always put his son first. *See* Exhibit E (Letter from Jessica Luciano). Those who know Eric and Tommy attest to the strength of their relationship. Eric's mother's current partner Franklin Kramer writes that, "Not in my recollection have I witnessed such a strong bond between father and son." Exhibit D (Letter from Franklin Kramer). Tommy's mother, Jessica Luciano, describes Eric as a "great father" who "is always here no matter what." Exhibit E (Letter from Jessica Luciano). *See also* Exhibit F (Letter from Dianne Lion) at 1 ("He made sure Tommy had a happy, meaningful and rich fun filled childhood. . . . [their] bond is and always has

6

been tight."); Exhibit G (Letter from Christine Amman) ("As long as Tommy was with Eric he was happy. . . . Eric has extreme love for his son."); Exhibit H (Letter from Jon Lion) ("Since Tommy was born there has been a father/son relationship like that you see in movies"). Tommy himself describes how, although his father was "never rich with money," there is a "richness" to the time they have spent together. Exhibit I (Letter from Thomas Rundstrom). Tommy's letter also makes clear that, despite Eric's financial challenges, residential instability, depression, and struggles with addiction, he has managed to be present for Tommy throughout his life. Tommy writes that "never did any of my father's sufferings shine into our time together or show in any way, in all our time together he was with me ever second." *Id.*



*Eric and Tommy, 2010*

**E.  Eric's stepfather's suicide and subsequent events sent him into a deep depression.**

After Eric's divorce in 2005 and the subsequent foreclosure, he eventually moved in with his mother and fifth stepfather, Timothy Manville, in their house in Wallingford. He grew close to his stepfather, though their relationship was complicated by his stepfather's alcohol-fueled violence towards Eric's mother. PSR ¶ 65. When his mother and stepfather divorced, Eric remained living in

the house with his stepfather—in part because he could not afford a place of his own at the time, and in part because it was a comfortable place for Tommy to live on the weekends, with a swimming pool, access to woods, and "a good family environment," as Eric's siblings and their families would gather there on the weekends. Exhibit A at 3.

On a Sunday in October 2013, after they had been living together for over five years, Eric's stepfather hung himself from a rafter in the garage of their home. PSR ¶ 65. Eric had left the house earlier in the day for work, but immediately headed home when he received a panicked call from Tim's girlfriend, who found Tim's body. When Eric arrived at the house, he witnessed his stepfather's body still hanging. His physical and emotional proximity to his stepfather's suicide was deeply upsetting for Eric. Two weeks after the suicide, Eric had to find another place to live, as his stepfather's family planned to sell the home quickly. Lacking other options, he moved in with his mother and his sister in a "cramped" two-bedroom trailer in Wallingford, a move that he thought would be temporary. Exhibit A at 3. With both bedrooms occupied, Eric slept on the floor.

Living in the trailer, he became severely depressed. He reflects being "plagued with thoughts of how my life had crumbled apart. Divorce, foreclosure, my stepfather's suicide. I felt like I was falling into a deep hole of depression." *Id*. His sister moved out of the trailer, and Eric moved into her old bedroom. Unable to save up enough money (or will) to move out, he eventually resigned himself to staying in the trailer. Eric writes, "The time I spent in that room in the trailer reminded me of the continuation of all my upheavals and it destroyed large parts of my hope, my will, and my spirit. I had been sober and drug free for many years, but in weakness I started using again. It wasn't enough to stop the pain, so I coupled it with turning to pornography again." Exhibit A at 4. During this period, he was dating a woman named Samantha, who was addicted to painkillers and supplied Eric with them as well; he became addicted and used painkillers daily during his relationship with Samantha.

PSR ¶ 71. Eric reflects that "I came to a point in my life which felt like there was no way out of the helplessness and I no longer cared what became of me, or the consequences I would face." Exhibit A at 4. It was at this point that he began viewing child pornography. He and Samantha broke up in 2017, and she overdosed on fentanyl and died shortly after their breakup, further piling on to Eric's feelings of loss, helplessness, and depression.

### F. Eric rehabilitated himself following his arrest in February 2019.

Since his arrest nearly three years ago in February 2019, Mr. Rundstrom has rehabilitated himself in myriad ways. First, he engaged in treatment, both for substance use and mental health. In June 2019, he successfully completed substance use treatment at MAAS. PSR ¶ 73. He has maintained his sobriety for his entire time on pretrial release. On February 22, 2019, just 8 days after his arrest, he voluntarily sought out and began individual therapy with a licensed clinical social worker, Jennifer Smith, whom he continued to see for over a year, until March 5, 2020.[4] Ms. Smith diagnosed Eric with major depressive disorder and generalized anxiety disorder. She notes that Eric was "highly active in therapy, often completing therapeutic 'homework' assignments outside of his sessions. . . . Through treatment, Mr. Rundstrom was able to identify connections between his past and those choices he had made in his present." Exhibit K (Letter from Jennifer Smith, filed under seal) at 2. He developed insight through therapy into himself and his offense conduct, as well as "appropriate coping skills," Exhibit K at 2. His depression and other diagnoses are now in remission, Exhibit C at 14, and he intends to re-engage in therapy again in the future if his depression recurs.

---

[4] Ms. Smith stopped seeing patients in March 2020 due to the pandemic, which is when Eric's treatment with her ended. Although she eventually resumed via video sessions with some patients, this was not possible for Eric due to his conditions of release, which prohibit him from accessing the internet. Eric felt that he had reached a comfortable stopping point, however. Ms. Smith remained and remains available to Eric by phone should he need her.

In January 2020, Eric earned his high school diploma and GED, a long-standing goal that he had been too depressed to accomplish in the past. PSR ¶ 7. He scored in the 92nd percentile on the language arts portion of the GED test. Exhibit L (diploma and GED results). Without internet access over the last three years, he "rediscovered [his] love of reading" and has read over a hundred books since his arrest. Exhibit A at 1. He has also challenged his son to read as many books as he can, too, and the two of them have read many of the same books and spent time discussing them, sharing favorite authors including Ian McEwan and Tom Wolfe.

For his entire time on bond, Eric has maintained his full-time employment as a manager at a grocery store in Middletown, Connecticut, working the overnight shift. Aside from the seven weeks that he was out of work following his knee surgery in July 2021, he has worked consistently. His work has been intensely stressful during the COVID-19 pandemic, particularly during the earlier stages of the pandemic. Nevertheless, he remained committed and has worked throughout the pandemic, knowing that his work is essential to the community.

Since February 2019, Eric has attempted to create as much stability in his life as possible. He has remained in the trailer in Wallingford, on his own after his mother moved out in June 2019 to join his brother's family in Cheshire. *See* Docs. #30, #31. He has spent every weekend with Tommy, first under supervision by his mother, as required by the Court, and since earning the Court's permission in November 2019, on his own.

For almost three years since his arrest, he has fully complied with the stringent conditions of his release, which include location monitoring, a curfew, and no access to the internet (except as

needed for employment, as approved by Probation).[5] Doc #9 at 2. And, although it is not a condition of his release, he has completely and totally abstained from all pornography.

Most importantly, Eric has accepted responsibility for his actions, reflected deeply on his offense, and has expressed remorse to his victims. He acknowledges that he used to think of the children depicted as "just images and videos on [a] screen," and that he justified his actions by telling himself that the images "exist whether I view them or not." He now sees it completely differently, after closely reading and reflecting upon the victim impact materials provided by the government. Exhibit A at 4. He recognizes that he was "wrong and completely selfish," and that he has contributed to the "pain and loss" of the victims. Although he recognizes that "[t]here is no apology I can make to those who wrote those statements that would suffice," *id.*, he has expressed his sincere apology and remorse, and he is firmly committed to never viewing child pornography again.

## II.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

On March 4, 2020, Mr. Rundstrom pled guilty to one count of receipt of child pornography. Even before his arrest, he was forthcoming and honest with law enforcement about his conduct, when agents arrived at his home to execute a search warrant. His offense involved over 1,000 images and 100 videos of child pornography. PSR ¶ 125. The images and videos that he received, viewed, saved,

---

[5] As described in the PSR, on January 23, 2020, the Probation Office submitted a notification of non-compliance to the Court, alleging that Mr. Rundstrom may have accessed the internet to post photographs to an Instagram account. Mr. Rundstrom appeared before Judge Merriam for a bond review hearing in February 2020. He explained that his son had "taken over" Mr. Rundstrom's old Instagram account after his arrest, and that his son had been posting photographs to the account—mostly images from album covers and movies— and that his son was sometimes doing this when they were together. The Court reiterated Mr. Rundstrom's conditions of release, and modified the conditions of release to prohibit Mr. Rundstrom's son (or any other guest) from bringing internet-accessible devices into Mr. Rundstrom's home. The Court did not find that Mr. Rundstrom had violated his conditions of release, nor did the Court find that the content of the account was inappropriate. The transcript of the bond review hearing is available on the docket at Doc. #61.

and shared depict horrific abuse of children. It goes without saying that his offense is extremely serious.

Importantly, this was a non-contact offense. Eric has never had sexual contact with a minor, nor has he ever attempted to do so. He has never solicited a minor for sex online, nor enticed a minor online to send him photographs or videos. His offense conduct was limited to downloading, sharing, and trading images and videos.[6] In short, Eric has never abused a child, and he never will.

Mr. Rundstrom's use of child pornography arose in his forties during a period of severe, untreated depression. Following his arrest, Mr. Rundstrom has dedicated tremendous energy to reflecting on his illegal behavior, trying to understand what caused it so that he will never repeat it again, and considering the impact of his actions on the victims.

## III.   LEGAL ANALYSIS

In determining a sentence, the Court is bound by the parsimony clause, which states that sentencing courts must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of [18 U.S.C. § 3553(a)]." 18 U.S.C. § 3553(a)(2). Accordingly, the court must impose the lowest available sentence that will sufficiently:

(A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) afford adequate deterrence to criminal conduct;
(C) protect the public from further crimes of the defendant; and
(D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.] 18 U.S.C. § 3553(a)(2).

---

[6] The PSR notes that "investigators also found evidence that suggested Mr. Rundstrom was actively communicating with minors via an internet-based application called 'Bigo Live.'" PSR ¶ 25. The PSR makes clear that "[n]o evidence was discovered that showed Mr. Rundstrom was soliciting minors for sex." PSR ¶ 26. There is also no evidence that Mr. Rundstrom's communications on Bigo Live were sexually explicit or of a sexual nature. Bigo Live (https://www.bigo.tv) is a legal website where users around the world can make videos or live-stream their activities, and others can view these videos or live-streams, comment on them, and chat with other users.

In addition, under 18 U.S.C. § 3553(a), sentencing courts must consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the kinds of sentences available;

(3) the kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant issued by the Sentencing Commission and in effect on the date of sentencing;

(4) any pertinent policy statement issued by the Sentencing Commission that is in effect on the date the defendant is sentenced;

(5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(6) the need to provide restitution to any victims.

Mr. Rundstrom asks the Court to impose a sentence of five years in prison, followed by five years of supervised release, which is the statutory mandatory minimum sentence for his offense. He also asks the Court to impose a special assessment in the amount of $100, and a restitution order. The proposed decade-long sentence (five years of prison, and five years of supervised release), in addition to the nearly three years that Mr. Rundstrom has spent on pretrial release under strict conditions, is sufficient to achieve the purposes of sentencing, and is the most appropriate sentence after considering all of the § 3553(a) factors.

## A. The applicable Guidelines range is 151 to 188 months.

The parties agreed in the plea agreement that Mr. Rundstrom's base offense level is 22. The plea agreement further identified five enhancements that the government believed may be applicable in Mr. Rundstrom's case, which increase the offense level by a total of 15 points; the defense reserved the right to argue against their application. Despite having reserved that right at the time of the plea agreement, upon further consideration, the defense does not dispute that the enhancements identified by the government technically apply in Mr. Rundstrom's case. Accordingly, the parties agree that the total offense level (after acceptance) is 34 and that the applicable Guidelines range is 151 to 188 months.

13

The PSR, on the other hand, calculates the applicable Guidelines range to be 210 to 240 months, based on a total offense level of 37. The PSR contends that a five-level enhancement under § 2G2.2(b)(3)(B) is more appropriate than the two-level enhancement under § 2G2.2(b)(3)(F) that was included in the plea agreement. Section 2G2.2(b)(3)(B) applies "[i]f the defendant distributed in exchange for any valuable consideration, but not for pecuniary gain," whereas § 2G2.2(b)(3)(F) applies "[i]f the defendant knowingly engaged in distribution." In support of its position, the PSR relies primarily on Mr. Rundstrom's statements to the FBI about his being a "trader."

 "There is no dispute that it is the government's burden to prove a sentencing enhancement under the Guidelines." *United States v. Caballero*, 93 F. Supp. 3d 209, 212 (S.D.N.Y. 2015), *aff'd*, 672 F. App'x 72 (2d Cir. 2016) (citing *United States v. Archer*, 671 F.3d 149, 161 (2d Cir. 2011)). The government noted in its PSR objection letter that "[t]he government is unaware at this point of an example in the evidence that shows a specific exchange in which Mr. Rundstrom distributed certain images of child pornography to a particular user in exchange for other images of child pornography he had received or any other form of valuable consideration he received." Doc. #97-3 at 2. In analyzing the applicability of § 2G2.2(b)(3)(B), the Second Circuit has stated that "for the enhancement to apply, the Government must advance *specific, individualized evidence* that [the defendant] provided access to his collection of child pornography to another user with the expectation that that user would provide similar access to other child-pornography files." *United States v. Bennett*, 839 F.3d 153, 161 (2d Cir. 2016), *as amended* (Oct. 7, 2016) (emphasis added). Here, where the government has stated that it is unaware of any specific, individualized evidence, the five-level enhancement should not apply.

However, if the Court determines that the five-level enhancement under § 2G2.2(b)(3)(B) does apply, Mr. Rundstrom requests that the Court depart downward to the agreed-upon offense level

of 34 (for a range of 151 to 188 months), to give effect to the parties' plea agreement, pursuant to *United States v. Fernandez*, 877 F.2d 1138, 1145 (2d Cir. 1989) (explaining that "a district court [] may depart from a Guidelines sentence in order to give effect to a plea bargain").

**B. The Sentencing Guidelines are unreasonable and irrational in this case.**

Whether the Court finds that the Guidelines range is 151 to 188 months, or 210 to 240 months, the range is absolutely staggering, particularly for a defendant with zero criminal history. A sentence anywhere near either of these ranges would be a substantively unreasonable sentence inconsistent with 18 U.S.C. § 3553(a). The Court should afford the Guidelines range no weight in this case, for the reasons explained below.

While the Court is required to consider the range of penalties suggested by the Sentencing Guidelines, the Court is not bound by that range. *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Moreover, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). District courts must reach "an informed and individualized judgement in each case" and impose the sentence that is "sufficient, but not greater than necessary to fulfill the purposes of sentencing." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).

The above principles are of the utmost importance when it comes to § 2G2.2, the section of the Guidelines at issue in Mr. Rundstrom's case. As this Court is no doubt well aware, the Sentencing Commission and the courts have repeatedly and consistently criticized § 2G2.2. The Second Circuit has warned that § 2G2.2 "is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010). The Second Circuit recently summarized *Dorvee*'s critique of § 2G2.2 as follows:

First, we observed that the Sentencing Commission has not been able to apply its expertise but instead has increased the severity of penalties "at the direction of Congress," despite "often openly oppos[ing] these Congressionally directed changes." Id. at 184–86. Second, we noted that four of the sentencing enhancements were so "run-of-the-mill" and "all but inherent to the crime of conviction" that "[a]n ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months" based on an offense level increased from the base level of 22 to 35. Id. at 186. We emphasized that this range was likely to be unreasonable because it was "rapidly approaching the statutory maximum" for distribution of child pornography, and because the offense level failed to sufficiently distinguish between "the most dangerous offenders" who "distribute child pornography for pecuniary gain and who fall in higher criminal history categories" and those who distribute for personal, non-commercial reasons. Id. at 186–87. Also, we held that this range demonstrated "irrationality in § 2G2.2" because it was substantially more severe than for an adult "who intentionally seeks out and contacts a twelve-year-old on the internet, convinces the child to meet and to cross state lines for the meeting, and then engages in repeated sex with the child." Id. at 187.

*United States v. Jenkins*, 854 F.3d 181, 188–89 (2d Cir. 2017) (holding that within-Guidelines sentence of 225 months for defendant who possessed and transported child pornography was substantively unreasonable and "shockingly high," even though defendant had refused to accept responsibility and showed "disdain for the law").

The teachings of *Dorvee* and its progeny apply directly to Mr. Rundstrom's case. One of the biggest problems with § 2G2.2 is the near-universal application of enhancements which dramatically increase the offense level but are "all but inherent to the crime of conviction." *Dorvee*, 616 F.3d at 186. As the Sentencing Commission explained in 2012 and reiterated in 2021, "Due to advancements in technology, enhancements that were only intended to apply to the most serious child pornography offenses were routinely applied to most non-production child pornography offenders."[7] According to

_____

[7] U.S. Sentencing Commission, *Federal Sentencing of Child Pornography Non-Production Offenses* (June 2021) at 2, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.

the most recent available data from the Sentencing Commission on the enhancements that apply in

Mr. Rundstrom's case:

- 95.4% of defendants sentenced under § 2G2.2 in 2019 received the (b)(2) enhancement (victim under 12 years old),

- 83.9% received the 2G2.2(b)(4) enhancement (sadistic/masochistic conduct or infant/toddler),

- 95.7% received the 2G2.2(b)(6) enhancement (use of a computer),

- 77.0% received the 2G2.2(b)(7)(D) enhancement (600 images or more), and

- 51.6% received either the (b)(3)(B) or (b)(3)(F) enhancement (distribution in exchange for a thing of value, or other distribution).[8]

As a result of the near-universal application of these enhancements, the Sentencing Commission has stated that "the current non-production guideline warrants revision in view of its outdated and disproportionate enhancements."[9]

The Second Circuit has long emphasized the appropriateness of imposing below-Guidelines sentences based on policy disagreements with § 2G2.2. *See, e.g.*, *United States v. Chow*, 441 F. App'x 44, 45 (2d Cir. 2011) ("*Dorvee* recognizes district courts' post-*Booker* authority to 'vary from the Guidelines range based solely on a policy disagreement with the Guidelines,' and encourages courts to take seriously that discretion 'in fashioning sentences under § 2G2.2' for child pornography defendants.") (internal citations omitted); *United States v. Tutty*, 612 F.3d 128, 133 (2d Cir. 2010) ("[T]he district court should . . . bear in mind that the 'eccentric' child pornography Guidelines, with

---

[8] U.S. Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics: Offender Based* (2019) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2019/Use_of_SOC_Offender_Based.pdf.

[9] United States Sentencing Commission, Federal Child Pornography Offenses (2012),

their 'highly unusual provenance,' 'can easily generate unreasonable results' if they are not 'carefully applied.'") (citing *Dorvee*, 604 F.3d at 98).

Across the country, courts rarely impose Guidelines sentences in non-distribution child pornography cases. Data available through the Sentencing Commission indicate that over the last five years, for defendants nationwide sentenced under § 2G2.2 who had a final offense level of 34 and were in Criminal History Category I, 82% received a downward departure or variance from the Guidelines range. For defendants sentenced under § 2G2.2 who had a final offense level of 37 and were in Criminal History Category I, 80% received a downward departure or variance.[10] These percentages do not include defendants who received a downward departure under § 5K1.1 for substantial assistance.

Mr. Rundstrom's Guidelines range (whether the disputed enhancement applies or not) is astronomical for someone in Criminal History Category I. Before subtracting 3 points for acceptance of responsibility, the adjusted offense level suggested in the PSR is 40, and the adjusted offense level contemplated in the plea agreement is 37. It is instructive to compare these numbers to the offense levels for other crimes. For example, an offense level of 37 or 40 is almost as high as the base offense level for first-degree murder (43), similar to the base offense level for second-degree murder (38), and 8 or 11 levels higher than the base offense level for voluntary manslaughter (29). Within the realm of sexual offenses, Mr. Rundstrom's offense level is higher than the base offense level that would apply if he had raped or trafficked a child, or if he had produced child pornography: aggravated sexual abuse of a minor has a base offense level of 38, and the base offense level for sex trafficking of a minor ranges from 24 to 34 under § 2G1.3. The base offense level for production of child

_____

[10] United States Sentencing Commission, Judiciary Sentencing Information, https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

pornography is 32. Just as in *Dorvee*, "[h]ad [the defendant] actually engaged in sexual conduct with a minor, his applicable Guidelines range could have been considerably lower." *Dorvee*, 616 F.3d at 187. Mr. Rundstrom acknowledges that his offense was extremely serious and in no way seeks to minimize that. But application of § 2G2.2 leads to an unreasonably and irrationally high Guidelines range that is grossly disproportionate to his offense conduct. Accordingly, the Court should vary downward significantly from the Guidelines and should give no weight to the advisory Guidelines range.

### C. Mr. Rundstrom's history and characteristics, and the nature and circumstances of the offense, weigh in favor of the proposed sentence.

18 U.S.C. § 3553(a)(1) directs the Court to consider a defendant's history and characteristics, as well as the nature and circumstances of the offense, in determining the sentence to be imposed. These factors weigh in favor of a five-year prison sentence followed by five years of supervised release. Mr. Rundstrom's use of child pornography arose during a time when he was experiencing severe and untreated depression after his stepfather's suicide. His offense was a non-contact offense. His conduct was limited to possessing, distributing, and trading child pornography; he has never had sexual contact with a minor nor attempted to do so, nor has he ever produced child pornography or enticed a minor to send him sexually explicit material. He has had appropriate sexual relationships with adult women throughout his adulthood. He has also had appropriate relationships with the children in his life, such as his son, nieces, and nephews; he has never been accused of inappropriate conduct towards a child.

The PSR suggests the Court consider that Mr. Rundstrom "immediately accepted responsibility for the offense and cooperated with case agents." PSR ¶ 114. Mr. Rundstrom accepted responsibility for his offense even before he was charged, and he has continued to accept responsibility every step of the way in the years since. Mr. Rundstrom voluntarily spoke at length

19

with case agents about his conduct when they executed the search warrant at his home several days before his arrest, and he spoke with agents again on the day of his arrest. He told the agents the location of his hard drive and thumb drive, which he used to store child pornography images. PSR ¶ 23. He again accepted responsibility by pleading guilty. And finally, he accepted responsibility through his actions while on pretrial release, his insightful letter to the Court, and by having reached a restitution agreement with three of the victims thus far (as explained in more detail below).

Mr. Rundstrom's history and characteristics are mitigating. He had a difficult childhood, characterized by a traumatic fatal car accident at age 8 followed by years of familial, residential, and educational instability. He turned to pornography as a maladaptive way to cope with his depression, much the same way he has turned to alcohol and drugs at various stages of his life. Through intensive individual therapy and self-reflection following his arrest, he has developed insight into his offense and the connection to his mental health, and has succeeded in abstaining from pornography, drugs, and alcohol for almost three years.

Despite his challenges with depression and addiction, Mr. Rundstrom has always been a hard worker and has worked consistently throughout his life, including for the last five years as an overnight manager at a grocery store. Since the start of the COVID-19 pandemic in early 2020, he has worked under stressful, thankless, and life-threatening conditions. Grocery workers during the pandemic have been praised by the media as "frontline heroes," though their pay and benefits do not reflect their "hero" status.[11] The Court should consider Mr. Rundstrom's work in the grocery store

---

[11] *See, e.g.*, Brookings Institute, *Meet the COVID-19 Frontline Heroes* (May 2020), https://www.brookings.edu/interactives/meet-the-covid-19-frontline-heroes/; Susan Selasky, "Food retailers see 'eye-popping profits' during pandemic. But frontline workers get crumbs," CHICAGO TRIBUNE (Dec. 8, 2020), https://www.chicagotribune.com/business/ct-biz-covid-19-frontline-workers-grocery-retail-20201208-nzbobitsl5bqzof3pyt7wptlve-story.html.

during the pandemic when determining his sentence. The Court should also consider his long history of employment more generally, and his service to our country during his time in the United States Army.

Mr. Rundstrom's family and friends describe him as incredibly kind, dependable, and selfless—a person who will "go out of his way for anyone." Exhibit G. *See also* Exhibit F (describing Eric as "one of the most caring people I know."). The people who are close to him will miss him dearly while he is incarcerated, and they will be here to support him and help him reintegrate when he is released. His absence will weigh heaviest on Tommy who, at 18, still leans heavily on his father for emotional support.

The Court should also consider Mr. Rundstrom's history and characteristics after his arrest, particularly his compliance with his conditions of release, his success in treatment, the effort he has put in to trying to understand his offense, and his demonstrated remorse.

**D. Mr. Rundstrom is unlikely to reoffend.**

Dr. Richard Krueger, M.D., performed a psychiatric and risk assessment of Mr. Rundstrom and concluded that his risk of re-offending is "remote." Exhibit C at 15. Dr. Krueger is a board-certified internist and psychiatrist with over four decades of experience, who specializes in assessing and treating sex offenders. For over 20 years he has been the medical director of the Sexual Behavior Clinic at New York State Psychiatric Institute. He is also an Associate Clinical Professor at Columbia University. He has "evaluated well over 1,000 individuals who have committed sexual crimes, from very low risk to very high risk individuals." Exhibit C at 15. His CV is attached as Exhibit M.

Dr. Krueger met with Mr. Rundstrom in July 2019 and again more recently, in September 2021. He diagnosed Mr. Rundstrom according to the DSM-5 with major depressive disorder; post-traumatic stress disorder; alcohol, cannabis, opiate, cocaine, and opioid use disorders; pornography

dependence; and a "paraphilic disorder not otherwise specified characterized by pedophilia, hebephilia and ephebophilia, *involving images only*." Exhibit C at 14 (emphasis added). Notably, following his final interview of Mr. Rundstrom in September 2021, Dr. Krueger concluded that all of Mr. Rundstrom's disorders are in remission (and the substance and alcohol use disorders are in "sustained remission"). Exhibit C at 14. Dr. Krueger also noted that a recent revision of the DSM-5, which is not yet published, has changed the criteria such that it is not possible to diagnose pedophilia on the basis of an interest in images only. *Id.* at 13. In other words, once the revision is published, Mr. Rundstrom will no longer meet the criteria to be diagnosed with pedophilia (or hebephilia or ephebophilia). Dr. Krueger stated that "[t]here is no indication that Mr. Rundstrom has ever tried to approach a child or abused a child." *Id.* at 13. He summarized that "over the several years before his arrest, coincident with a significant depression, [Mr. Rundstrom] began using pornography compulsively, as some individuals do if they are depressed, and while doing this accessed and used child pornography. His use of child pornography was also associated with significant use of cannabis." *Id.* at 14.

Dr. Krueger assessed Mr. Rundstrom's risk of committing another sexual crime using six different actuarial instruments and concluded that "Mr. Rundstrom's risk of re-offense is low according to 6 instruments used to assess such risk and in my opinion is remote." Exhibit C at 15. He opined that Mr. Rundstrom "could be easily monitored by federal probation when he is released to the community." *Id.* at 14-15. He further opined that "[i]n my opinion, incarceration is not necessary to reduce his risk and increasing his period of incarceration beyond the mandatory 5 year minimum would not materially decrease his risk of reoffense." *Id.* at 15.

The Court should consider Dr. Krueger's expert assessment of Mr. Rundstrom's low risk of reoffending when determining the length of his prison and supervised release terms.

**E.  The principle of incremental punishment weighs in favor of a five-year prison sentence.**

Mr. Rundstrom's complete lack of a criminal history and the concept of incremental punishment support his request for the mandatory minimum sentence. Mr. Rundstrom is 47 years old and has never been arrested, charged with a crime, or convicted of a criminal offense before this case. The fact that Mr. Rundstrom has never served a prior sentence suggests that a sentence greater than five years would be disproportionate. In *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001), the Second Circuit stated the following:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses[.]

Although the *Mishoe* court's inquiry was prompted by the Career Offender Guidelines, the court's reasoning applies in the present case. There is no reason to believe that a sentence longer than five years would be more effective than a five-year sentence, because there is no point of comparison or historical example to disprove the efficacy of a lower sentence. *See, e.g.*, *United States v. Bun*, 3:13cr174(SRU), Judgment (ECF No. #72) (citing *Mishoe* and stating that "[t]he sentence imposed represents an incremental increase that should be sufficient to serve the purposes of sentencing"); *United States v. Keels*, 3:15cr17(JCH) (imposing below-Guidelines sentence based in part on the concept of incrementally proportionate sentencing philosophy).

**F.  The purposes of sentencing under § 3553(a) weigh in favor of a sentence of five years in prison, followed by five years of supervised release.**

Pursuant to § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary" to achieve the following purposes of sentencing: (1) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) specific and general deterrence;

(3) public safety; and (4) rehabilitation. As explained below, a five-year prison sentence, followed by five years of supervised release, will accomplish each of these goals.

1. *The proposed sentence will reflect the seriousness of the offense, promote respect for the law, and provide just punishment.*

A sentence of five years in prison followed by five years of supervised release with strict conditions will reflect the seriousness of the offense, promote respect for the law, and provide just punishment, as required by 18 U.S.C. § 3553(2)(a). Mr. Rundstrom acknowledges that his offense was extremely serious. A sentence of five years in prison followed by five years of supervised release is a severe sentence that adequately reflects the seriousness of the offense.

Mr. Rundstrom has demonstrated respect for the law from the moment the FBI agents entered his home. He has meticulously complied with the conditions of his release and has shown respect towards everyone involved in his case, including the Probation Office, law enforcement, the prosecutor, and the Court.

As for just punishment, five years in prison is an extremely punitive sentence, especially for a first-time offender. Several factors in this case will make his period of incarceration even more punitive. Because of the nature of his offense, Mr. Rundstrom will be part of a vulnerable population in the Bureau of Prisons and could be targeted for violence by other inmates. Indeed, the Warden of MDC Brooklyn has testified that sex offenders can be placed in a category with cooperators and law enforcement officers as inmates "especially subjected to harassment and physical violence." *Defreitas v. Lindsay*, 2008 WL 4850195 at 3 (E.D.N.Y. Nov. 6, 2008). Because he will be beginning his prison sentence during a pandemic, opportunities for programming, vocational training, and work within the BOP will likely be reduced for at least some of his time in custody. It is also reasonable to expect frequent 23-hour lockdowns and restricted visitation, as has occurred at most BOP facilities throughout the pandemic.

The strict conditions of supervised release, to which Mr. Rundstrom will be subject for at least five years following his release from prison, will further punish him. On supervised release, Mr. Rundstrom will need to comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901 *et seq.*), as well as the Connecticut sex offender registration requirements. He will likely be subject to periodic polygraph testing at the discretion of the Probation Office. Although he committed a non-contact offense, he may be prohibited from contact with minors and prohibited from being in locations where minors are likely to gather. He will likely be subject to repeated financial disclosures, and subject to searches by the Probation Office of his person, residence, vehicle, and media devices. His internet use will be monitored by the Probation Office, and he will be required to subject his electronic devices to unannounced reviews. Should the Probation Office determine that Mr. Rundstrom poses a risk to another person, he will be required to notify that person of the risk.

In addition to the sentence imposed by the Court, Mr. Rundstrom will also be subject to the many collateral consequences of his first and only criminal conviction. When determining a "just punishment" under 18 U.S.C. § 3553(a)(2)(A), a sentencing court should consider the collateral consequences of a conviction. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."). Individuals with criminal records "face potentially thousands of collateral consequences upon reentering society."[12] Mr. Rundstrom's conviction will follow him for the remainder of his life and he will be subject to many of these collateral consequences.

---

[12] U.S. Commission on Civil Rights, *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* (June 2019), https://www.usccr.gov/pubs/2019/06-13-Collateral-Consequences.pdf?eType=EmailBlastContent&eId=d37030a2-bfe6-4784-866a-7db61d64f357.

And above and beyond the collateral consequences of a felony conviction, Mr. Rundstrom will experience the consequences of a sex offense conviction specifically, which include lifelong social stigma, difficulty finding housing, and difficulty finding employment.

In assessing just punishment, the Court should also consider Mr. Rundstrom's time on bond, during which he has been subject to strict conditions including GPS monitoring, a curfew, and no access to the internet, for almost three years. Although punishment is not the purpose of pretrial release conditions, these conditions have significantly curtailed Mr. Rundstrom's freedoms, including his freedom of movement and freedom of association. Having no access to the internet in 2021 is incredibly challenging and burdensome. His conditions have also punished him financially. Mr. Rundstrom is required to pay a $120 monthly fee for his GPS monitor; in total, he has spent over $3,000 for monitoring during the course of his time on bond. The Court should take into account Mr. Rundstrom's pretrial release conditions (and their duration) in determining whether the proposed sentence would be sufficiently punitive. *See, e.g.*, *United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167, 1174–75 (D. Or. 2012) (person subject to conditions of pretrial supervision is "confined" because "they are subject to restraints not shared by the public generally that significantly confine and restrain their freedom"); *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) ("[P]retrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty"); *United States v. Lizardi-Maldonado*, 275 F. Supp. 3d 1284, 1296 (D. Utah 2017) (collecting cases where "courts have found an electronic monitoring condition . . . constitutes a significant restraint on liberty").

 2. *The proposed sentence will deter Mr. Rundstrom and others.*

Mr. Rundstrom has already been deterred from any further criminal conduct, as evidenced by his record over almost three years of pretrial release. Having spent over a year in therapy, he now has tools and resources he lacked before, and he knows that if his depression recurs, he will immediately

re-engage in therapy. Mr. Rundstrom will also be deterred by the many conditions of supervised release, including internet monitoring and searches by the Probation Office, during his term of supervised release. After he completes his term of supervised release, at which point he will be approaching 60 years old or even older, he will continue to be deterred by the extremely harsh penalties associated with repeat sex offenses.

As for general deterrence, it is not clear that the severity of a sentence—as distinct from the certainty of its imposition—has any significant general deterrent value.[13] Nevertheless, a five-year prison term, followed by five years of supervised release, for a first-time offender who did not have any contact with minors, sends a message to others that child pornography offenses are and will be punished severely.

3. *The proposed sentence will protect the public.*

The proposed sentence is also sufficient to safeguard the public. There is no evidence to suggest that Mr. Rundstrom poses a risk of committing a contact sex offense. And Mr. Rundstrom has already shown, through his compliance with his pretrial release conditions, that he does not pose any risk to the public when he is monitored and receiving appropriate treatment. When Mr. Rundstrom is released to the community, he will be subject to strict conditions of supervised release that will further protect the public.

4. *Of the sentences available, the proposed sentence will provide Mr. Rundstrom with treatment in the most effective manner.*

Mr. Rundstrom's rehabilitation began from the moment of his arrest. He has already received and successfully completed significant treatment while on release, including substance use treatment

---

[13] Gary Kleck et al., The Missing Link in General Deterrence Research, 43 CRIMINOLOGY 623 (2005).

and a year of intensive individual therapy. His depression and PTSD are now in remission, along with his dependence on pornography. Exhibit C at 14. He earned his GED while on release and has continued to work at his full-time job. Incarceration will inhibit, rather than aid, Mr. Rundstrom's rehabilitation.

Nevertheless, Mr. Rundstrom plans to take advantage of the treatment options available to him while he is incarcerated. In particular, he is interested in the Residential Drug Abuse Program (RDAP), given his long history of drug abuse, including around the time of his offense. Dr. Krueger indicated that Mr. Rundstrom is an "excellent candidate" for RDAP. Exhibit C at 15. RDAP takes about nine months to complete.[14] Unfortunately, it is unlikely that Mr. Rundstrom will receive regular mental health treatment while in the BOP, given that "[a]s of February [2018], the Bureau of Prisons classified just 3 percent of inmates as having a mental illness enough to require regular treatment."[15] Many BOP facilities include only one or two psychologists, resulting in caseloads of well over 300 inmates per psychologist.

There is no treatment purpose to keeping Mr. Rundstrom incarcerated for more than five years. Once he begins his term of supervised release, he will almost certainly be ordered by the Probation Office to complete sex offender treatment in the community, and he will also have the opportunity to resume mental health treatment and/or substance use treatment, if appropriate.

---

[14] https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp.
[15] *See* Christie Thompson & Taylor Elizabeth Eldridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons,* THE MARSHALL PROJECT (Nov. 21, 2018), http://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons.

**G. The proposed sentence will avoid unwarranted disparities between Mr. Rundstrom and other similarly situated offenders.**

A sentence of five years of imprisonment followed by five years of supervised release for Mr. Rundstrom would be consistent with sentences imposed in similar cases, whereas a higher sentence would lead to unwarranted disparities.

Court in this District have varied downward to the mandatory minimum in other receipt of child pornography cases involving Guidelines ranges similar to Mr. Rundstrom's. *See, e.g.*, *United States v. Richard Doyle*, 3:13-cr-227(VLB) (varying downward to five years from a Guidelines range of 210 to 240 months and an offense level of 37 for defendant who worked as a high school teacher for 35 years); *United States v. Parilla*, 3:12-cr-140(VLB) (varying downward to five years from a Guidelines range of 210 to 240 months and an offense level of 37 for pediatrician who pled guilty to receiving and distributing child pornography, possessed over 100,000 images and over 10,000 videos, traded images online, and collected child pornography for eleven or twelve years); *United States v. Adam Petrowski*, 3:12-cr-184(JBA) (imposing 44-month prison sentence in receipt case involving Guidelines range of 210 to 240 months, where defendant possessed "hundreds of thousands of images and approximately 2,000 videos of child pornography that were highly organized within the defendant's computer," and traded images with others). Indeed, Courts in this District have routinely imposed the five-year mandatory minimum in cases involving receipt or distribution of child pornography where there is no evidence that the defendant abused a child. *See, e.g.*, *United States v. William Millett*, 3:18-cr-127(VAB) (five-year sentence for receipt of child pornography); *United States v. Mark Rohrer*, 3:18-cr-210(SRU) (same); *United States v. Michael Hull*, 3:17-cr-132(SRU) (same).

Defendants convicted of possession, rather than receipt, of child pornography have received even lower sentences, because possession has no mandatory minimum—even though the offense

conduct in these two types of cases is often "materially identical."[16] As the Sentencing Commission has noted, "the underlying offense conduct in the typical receipt case was indistinguishable from the typical possession case, yet widespread sentencing disparities existed among similarly situated offenders sentenced under the non-production child pornography guideline based largely on whether they were charged with receipt or possession."[17] *See, e.g.*, *United States v. Paul Hubbard*, 3:16-cr-126(VAB) (16-month sentence for defendant convicted of possessing more than 300 videos and 6,000 images); *United States v. Tim Allen*, 3:15-cr-221(AVC) (24-month sentence for defendant convicted of possessing 3,060 videos and 466,177 images); *United States v. John Perugini*, 3:20-cr-250(VLB) (33-month sentence for defendant convicted of possessing over 600 images and who admitted to having used child pornography for seven to ten years); *United States v. Michael Bauer*, 3:18-cr-96(VLB) (35-month sentence for possession of 1,300 videos and 100,000 images).

Cases involving conduct that is dissimilar to (and more serious than) Mr. Rundstrom's, because they involved actual or attempted contact with minors, have also resulted in sentences that are at or close to the mandatory minimum. For example, in *United States v. Gregan*, Case No. 3:19-cr-253(JCH), the defendant messaged online with a 13-year-old boy over the course of three days; the 13-year-old boy sent the defendant sexually explicit photographs and a sexually explicit video of himself to the defendant at the defendant's request. Mr. Gregan pled guilty to receipt of child pornography, and the Court sentenced him to five years of imprisonment. Moreover, Mr. Gregan and his minor victim "discussed meeting in person to engage in sexual acts," and Mr. Gregan was previously "involved in a sexual relationship with a teenage girl," from whom he requested sexually

---

[16] U.S. Sentencing Commission, *Federal Sentencing of Child Pornography Non-Production Offenses* (June 2021) at 18, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.

[17] *Id.*

explicit photos; he also possessed a child pornography video of the teenage girl engaging in explicit conduct. *See United States v. Gregan*, Case No. 3:19-cr-253(JCH), Doc. #27. Another case, *United States v. Gotti*, 3:18-cr-335(VAB), involved similar conduct to *Gregan*. Mr. Gotti engaged in sexually explicit conversations with a 13-year-old boy online; the boy sent Mr. Gotti sexually explicit photographs and a sexually explicit video of himself at Mr. Gotti's request. Mr. Gotti had a Criminal History Category of V and had previously been convicted of sexually assaulting a 14-year-old. The Court sentenced Mr. Gotti to 80 months of imprisonment. *See also United States v. Gauvin*, 3:18-cr-223(MPS) (five-year sentence for 43-year-old who paid at least five minor victims to engage in sexual conduct on video live-stream, where Guidelines range was 108 to 135 months); *United States v. Koerner*, 3:20-cr-156-JBA (70-month sentence for defendant convicted of distribution of child pornography, where Guidelines range was 188 to 235 months, and where defendant "engaged in a persistent effort to obtain nude pictures from minor females" over the Kik social media application; after posing as a teenage boy and receiving sexually explicit images from minor females, Koerner would trade those images with other Kik users in exchange for more child pornography).

Accordingly, the Court should impose the mandatory minimum sentence in Mr. Rundstrom's case in order to avoid unwarranted disparities among similar cases, and in order to avoid punishing him more harshly than defendants convicted of more serious conduct.

**H. The Court should impose restitution.**

In determining an appropriate sentence, the Court is also required to consider "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). To date, the government has indicated that it is seeking restitution on behalf of three identified victims in this case. Those three victims are represented by counsel, and Mr. Rundstrom has reached a restitution agreement with those three victims, through their counsel. The parties intend to present more information to the Court closer

to sentencing regarding a proposed restitution order. If additional victims submit restitution requests before sentencing, Mr. Rundstrom requests that the Court consider setting a restitution hearing for a later date within 90 days after the sentencing hearing, as permitted by 18 U.S.C. § 3664(d)(5).

### I. The Court should impose a special assessment of $100 and no other assessments.

The Court must impose the $100 special assessment required under 18 U.S.C. § 3013(a)(2). PSR ¶ 100. Mr. Rundstrom is also potentially subject to additional assessments of $5,000 under 18 U.S.C. § 3014, and up to $35,000 under 18 U.S.C. § 2259A. The Court should decline to impose those additional assessments (which are akin to fines), because Mr. Rundstrom is unable to afford them. 18 U.S.C. § 3014 makes clear that it applies only to persons who are "non-indigent." 18 U.S.C. § 3014(a). 18 U.S.C. § 2259A directs the Court to "consider the factors set forth in sections 3553(a) and 3572," which include "the defendant's income, earning capacity, and financial resources." 18 U.S.C. § 3572(a)(1). Although he is currently employed, Mr. Rundstrom barely earns enough to meet his monthly expenses. His only asset is his car, which is worth around $3,000. He owes around $2,000 in medical and credit card debt. Doc. #97-4. Once he is incarcerated, he will no longer have income. It would not be appropriate or just to impose the additional assessments in this case.

### CONCLUSION

Eric Rundstrom is a caring, thoughtful, and humble person, who is deeply remorseful for his use of child pornography and its irreversible impact on minor victims. Because of the mandatory minimum that applies in this case, the Court has no choice but to punish Mr. Rundstrom severely for his actions. On top of the nearly three years that he has spent on pretrial release subject to strict conditions, he will serve at least five years in prison, and five years on supervised release. For the reasons described in this memorandum, any sentence greater than the mandatory minimum would run counter to the purposes of sentencing and would violate the parsimony clause of 18 U.S.C. § 3553(a).

Respectfully Submitted,

THE DEFENDANT,
Eric Rundstrom

FEDERAL DEFENDER OFFICE

Date: October 11, 2021

*/s/ Carly Levenson*
Carly Levenson
Assistant Federal Defender
235 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: phv09665
Email: carly_levenson@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 11, 2021, a copy of the foregoing motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Carly Levenson
Carly Levenson